IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

VERNE H.,[1]

    Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

    Defendant.

_____

Civ. No. 1:20-cv-579-MC

OPINION AND ORDER

MCSHANE, Judge:

    Plaintiff brings this action for judicial review of the Commissioner's decision denying his application for disability insurance benefits. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). On September 11, 2018, Plaintiff filed an application for benefits, alleging disability as of June 1, 2017. Tr. 30.[2] Plaintiff later amended the onset date to May 1, 2018. After a hearing, the administrative law judge (ALJ) determined Plaintiff was not disabled under the Social Security Act. Tr. 15-26. Plaintiff argues the ALJ erred in finding him less-than fully credible, in weighing the opinion of an examining psychologist, in rejecting lay witness testimony from Plaintiff's wife, and in failing to give great weight to the disability findings made

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the non-governmental party in this case.
[2] "Tr" refers to the Transcript of Social Security Administrative Record provided by the Commissioner.

1 – OPINION AND ORDER

by the VA. Because the Commissioner's decision is based on proper legal standards and supported by substantial evidence, the Commissioner's decision is AFFIRMED.

## STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). To determine whether substantial evidence exists, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. *Davis v. Heckler*, 868 F.2d 323, 326 (9th Cir. 1989). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 523 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)).

## DISCUSSION

The Social Security Administration utilizes a five-step sequential evaluation to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520 & 416.920 (2012). The initial burden of proof rests upon the claimant to meet the first four steps. If the claimant satisfies his burden with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R. § 404.1520. At step five, the Commissioner must show that the claimant is capable of making an adjustment to other work after considering the claimant's residual functional capacity (RFC), age, education, and work experience. *Id*. If the Commissioner fails to meet this burden, then the

claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001).

The ALJ determined Plaintiff had the following severe impairments: left knee medial meniscus tear status post-surgical repair; Post Traumatic Stress Disorder (PTSD); and depression. Tr. 18. The ALJ concluded Plaintiff had the RFC to perform light work with the following relevant additional restrictions: that he perform only short, simple, routine job instructions consistent with unskilled work; that he should not interact with the public but could have occasional interactions with co-workers and supervisors; and that he needs a static work environment with few changes in work routines and no teamwork jobs with co-workers. Tr. 20. Plaintiff argues the ALJ did not capture the extent of his limitations.

The ALJ noted that despite tearing his meniscus while employed as a police officer, Plaintiff's recovery following a January 2018 knee surgery allowed him to perform light work with additional restrictions regarding kneeling, crawling, and using foot controls. This is supported by substantial evidence in the record. The ALJ noted that Plaintiff was released back to light duty four weeks after the surgery. Tr. 21. The ALJ noted that one year after the surgery, Plaintiff reported his knee was "just a little" sore and reported the surgery was a success. Tr. 21. This is supported by the record. At Plaintiff's January 2019 follow up with the orthopedic surgeon, Plaintiff reported his "knee is still just a little sore . . . but for the most part it's improved and his surgical outcome has been a success in his eyes. He feels as though the pain he had after his injury has resolved for the most part and the residual symptoms he is describing are more or less his baseline." Tr. 469. The ALJ did not conclude that Plaintiff's knee was pain free,

but rather that Plaintiff was able to perform light work with additional knee-related restrictions. Additionally, the ALJ noted the knee-related limitations in the RFC were consistent with the opinion of consultative examiner who performed a January 2019 examination. Tr. 21-22.

Regarding Plaintiff's mental limitations, the ALJ noted that immediately following Plaintiff's June 2018 termination from his job as a police officer, Plaintiff suffered suicidal thoughts and severe depression requiring hospitalization, but that his condition stabilized and improved with therapy over the following year. The ALJ summarized the record regarding Plaintiff's PTSD and depression:

> The record shows that the claimant was in a VA hospital from June 4, 2018 through June 13, 2018, due to suicidal and homicidal ideation. The claimant was discharged with the diagnoses of Depressive Disorder NOS, Adjustment Disorder with mood and anxiety symptoms and chronic, combat related PTSD. The records show that the claimant was admitted due to suicidal thoughts/behavior. The claimant reported that he had been recently fired from his job as a police office[r] after having been found to have hydrocodone in his symptoms after being in a motor vehicle accident. The claimant stated he had been worried about his reputation in the community as well as his ability to support his family. He found himself sitting on his back porch with a gun and only put it down because thoughts of his nephew came to mind. The discharge summary showed that while the claimant was initially angry and expressed some homicidal thoughts towards the Gold Beach Police Department, they went away after a few days as did his suicidal thoughts. The summary indicates that the claimant was treatment focused and his mood and affect and his sleep improved during his stay.
>
> The records show that the claimant did participate in group and individual therapy after discharge from the hospital. In October 2018, after a failure to show for an individual appointment, the claimant was called and he reported that he was doing well, and the treatment notes show that the claimant was removed from the high-risk suicide list in September 2018. The claimant continued to attend the recommend[ed] therapy appointments, though not always on a regular basis. The medical record also shows that the claimant continued to deny any suicidal and/or homicidal ideation. Recent treatment records show that the claimant is participating in cognitive processing therapy. In May 2019, the VA treatment records show that the claimant updated his mental health treatment plan. The Mental Status Exam conducted as a part of updating the treatment plan showed that the claimant was calm, cooperative, had no evidence of a thought disorder, had no emotional blunting, his insight, judgment and impulse control were good, and while the claimant's memory appeared intact he reported that he tended to forget things "fairly quick." The record also shows that the claimant reported

> doing well overall, with only occasional down swings with his mood that would usually coincide with significant events such as his 50th birthday. Despite the occasional downswings with his mood, the record notes there was no indication of acute elevated risk of suicidal/homicidal ideation. As of July 2019, the claimant reported that "those pills really have been helpful" and that he made it through a low period. The record reflects that the claimant continued to seek treatment and reported no more downswings in his mood, and that things were going well. At the hearing, the claimant stated that he does not want to be around anybody and that he stopped going to group therapy because of that. He related that the stories of the other members were triggers for him. He was able to spend time with a friend, helping with building a deck. The claimant explained while he was not much help with the actual building, because he has difficulty with bending and lifting, it was a chance for him to spend some time with a friend he had known for 10 years.

Tr. 22-23 (internal citations omitted).

Although Plaintiff argues the ALJ arbitrarily discounted his statements regarding mental limitations, the ALJ's thorough summarization of the record (and the conclusion that Plaintiff stabilized with time and treatment) is supported by substantial evidence in the record and is consistent with the RFC limiting Plaintiff to jobs with simple instructions consistent with unskilled work, few changes in routine, no interaction with the public, occasional interaction with coworkers and supervisors, and no tasks requiring teamwork with co-workers. In other words, the ALJ provided "specific, clear, and convincing reasons" for finding that although Plaintiff alleged severe mental limitations, the record indicated Plaintiff was capable of performing routine jobs and following simple instructions with little interaction with the public or co-workers. *Morgan v. Comm'r*, 169 F.3d 595, 599 (9th Cir. 1999).

As noted above, Plaintiff was hospitalized after planning to shoot himself three days after being fired as a police officer. Tr. 353. Plaintiff reported he took Vicodin following knee surgery and his patrol car was hit by an elderly driver. Tr. 252. Intake notes indicate:

> He was drug tested because of this and put on administrative leave d/t testing positive for Vicodin. Pt states he returned after 30 days and was fired. Reports this 'ruined his life.' Pt with thoughts of self harm and planned to shoot self. Now

reports is angry and would shoot the person who ruined his life if he left the facility.

Tr. 352.[3]

Nine days later, upon discharge, Plaintiff had stabilized:

He is alert, well-groomed, cooperative, pleasant. Brow is furrowed. He makes good eye contact, walks with a steady gait. . . . Patient was a police officer for 10 years, but was fired on 6/1/18 because he had hydrocodone in his urine at the time of a MVA when a 83 yr old woman rear-ended him. He had recently purchased a home, and felt panicked about how he would pay for his mortgage and support his family. He lives in Gold Beach, and there are hardly any other jobs in the town, and certainly none as well-paying as the one he had. He worried his reputation in the community would be ruined b/c people would think of him as a pill popper. Hours later, he found himself sitting on his back porch, pressing the barrel of a loaded pistol upwards under his chin, but his nephew came to mind. his nephew Hunter came to his mind, and he quickly put down the gun. . . . He was initially angry, and expressing homicidal thoughts towards the Gold Beach police dept, so they were given a Tarasoff warning. His homicidal thoughts turned to aggressive thoughts of wanting to hit them and cuss them out, but these also went away within a few days. He was treatment-focused. His mood improved, his affect brightened. His suicidal thoughts went away. His sleep improved. He was not a behavioral management problem on the unit." Tr. 358.

Tr. 356-58.

Two months later, "He reports 'I am feeling better right now' and he appears to be quite euthymic, has an appearance of being relieved." Tr. 344. Plaintiff's financial concerns were somewhat alleviated after receiving VA disability. "He reports that he is eating better; socializing most days that [sic] going to the coffee shop and chatting 'with the old guys[,] the chosen few.'" Tr. 345. Plaintiff had appropriate behavior and was cooperative, with his memory appearing grossly intact. Tr. 345. One month later, in September 2018, Plaintiff further stabilized and the

---

[3] Although Plaintiff testified that he was fired for a positive drug screen and for using excessive force, contemporaneous treating records only mention the on-duty car accident and subsequent positive drug test. Tr. 312-313 (May 2018 treating note stating Plaintiff had been "placed on administrative leave" after being "involved in a motor vehicle accident as a police officer. He was hit from behind and apparently he has been criticized by his department as he had taken some medicine several hours before his shift."); Tr. 352; Tr. 356. In contrast, nearly one year after being fired, notes from a consultative mental status examination states, "He related he worked as a cop for 10 years, but lost his job because he could not control his temper." Tr. 627. As discussed below, the ALJ gave little weight to the opinion of the doctor who performed that examination.

VA inactivated his high risk for suicide. Tr. 335. Notes indicate "The patient is engaged in treatment, has reduced risk factors and/or increases in protective factors, and has a safety plan in place." Tr. 335. At that time, Plaintiff "reports that the medications are working, 'keeping me level.'" Tr. 337. Plaintiff was oriented, exhibited appropriate behavior, was cooperative, his "[m]emory appears to be grossly intact," had linear and goal-directed thought process with fair insight and judgment. Tr. 338. Plaintiff still reported some depression upon discharge. Tr. 340.

Like most individuals seeking disability, Plaintiff's condition was not static. After a September 2018 no-show, Plaintiff's therapist called Plaintiff and noted, "He sounded happy and reported he is doing well." Tr. 608. In October 2018, Plaintiff reported "I've been in a good spot for 2-3 weeks now," but was still depressed. Tr. 605-606. Plaintiff "reports he is doing quite well considering all circumstances; it is not at elevated risk for suicide; does not have any acute concerns that need to be addressed immediately." Tr. 607. In October 2018, Plaintiff reported increased depression due to a recent stressor. Tr. 524 ("[T]he union backed out and I lost heavy . . ." with regard to his termination). In a VA group PTSD session, notes indicated "He was highly engaged in the group process, shared readily and upon prompting, self-divulged, listened to his peers intensely with maintained attentiveness, and otherwise demonstrated behavior appropriate to the group setting." Tr. 522.

In late 2018, Plaintiff reported another stressor in the form of an altercation with his daughter's boyfriend. Tr. 520. "Veteran appears quite distressed by marital strain and continued struggle with adjusting to role reversal and lacking sense of purpose." Tr. 520. Two weeks later, "He reports that he has had 'a good couple of days; everything's going pretty good.'" Tr. 509. "Veteran reports that he has been reaching out and arranging outings with positive support people." Tr. 510. In mid-December 2018, Plaintiff "has no concerns today. Veteran says he has

been seeing mental health and it's helping." Tr. 506. One month later, Plaintiff had increased depression and isolation. Tr. 486, 491. Plaintiff "appeared slightly lethargic at least once, but maintained attentiveness and engagement throughout the session." Tr. 493. Plaintiff then had increased depression which he attributed to an issue with his medication and a respiratory ailment. Tr. 478. "Reported working on his home to get it ready to sell. Attitude during interview: Cooperative and initially anxious but overall cooperative and friendly–is able to chuckle from time to time. Mood: doing fairly well–daughter is no longer involved with abusive boyfriend–thinking of moving." Tr. 482. Although Plaintiff reported recent memory and distraction problems, the therapist noted "immediate memory able to recall 4/4." Tr. 483.

By mid-2019, Plaintiff reported "Keeping busy and managing well." Tr. 652. Plaintiff had improved memory with new medication. "Denies remote memory problems and able to recall 3/3 immediate memory." Tr. 653. "I made it through my low period . . . boy those pills really have been helpful . . . I've been keeping busy and went out and helped a friend on some construction. . ." Tr. 659. Although Plaintiff was still very depressed due to no longer working, "He related doing a lot better with regard to his PTSD symptoms[.]" Tr. 663.

The ALJ's detailed summary of Plaintiff's treatment records is not a cherry-picked characterization of Plaintiff's mental health treatment. Instead, the summary, along with the RFC the ALJ aligned with those records, is supported by substantial evidence in the record. Again, the ALJ agreed that Plaintiff had significant limitations due to depression and PTSD. But despite those limitations, the ALJ concluded he could perform some simple work with little interaction with others. That determination is supported by the record. The ALJ provided clear and convincing reasons for finding Plaintiff was not as limited as alleged.

The ALJ also noted that Plaintiff's allegation that he was incapable of performing any work contrasted with the fact that Plaintiff collected unemployment benefits after being fired as a police officer. *See* Tr. 17-18 ("The record shows that the claimant has received unemployment compensation benefits after his alleged onset date (13D). The undersigned notes that inherent in the request for unemployment compensation is representing that one is ready, willing, and able to work and actually looks for work."). In fact, at the hearing, Plaintiff testified that he actively looked for employment during the time he collected unemployment. Tr. 45-47. Plaintiff testified he looked for retail work, "I was looking more for, like, warehouse work. Anything that would keep me off the floor . . . so I didn't have to deal with anybody. Stocking shelves, [loading and unloading trucks,] filling shelves, whatever, at night when there's nobody around. I was looking for nighttime work." Tr. 45. When questioned whether he would have been successful if he found a job, Plaintiff stated, "I think it would have been a minimum-wage job. So I don't know if that's successful or not. I went, you know, I was at almost 30 dollars an hour as a police officer. So, probably not because I was looking for something a little more than that, you know, than a minimum-wage job, and that's basically all that was around, so." Tr. 46-47 (questions from transcript omitted).

The ALJ did not err in utilizing "ordinary techniques of credibility evaluation" in weighing the validity of Plaintiff's self-reported limitations. *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996)). Although Plaintiff argues another interpretation of the record is reasonable–i.e., that the record indicates that due to anger and memory issues, he cannot perform any job–that is not a legitimate reason for overturning the ALJ's conclusions. *See Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 523 (9th Cir. 2014) ("If the evidence can reasonably support either affirming or reversing,

'the reviewing court may not substitute its judgment' for that of the Commissioner.") (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996))). Because the ALJ provided "specific, clear and convincing reasons" for finding Plaintiff less-than credible regarding the extent of his limitations, the ALJ did not err in giving little weight to Plaintiff's testimony regarding those limitations.[4] *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quoting *Smolen*, 80 F.3d at 1282).

Plaintiff also argues the ALJ erred in giving little weight to the opinion of Dr. Kimel Limon, PsyD. Dr. Limon conducted an April 2019 Mental Status Examination. Tr. 23. In Discussing Dr. Limon's opinion, the ALJ provided:

> The undersigned finds the opinion of Dr. Limon not persuasive as he gave the claimant limitations that [were] not supported by his examination, he did not explain how he came to his determinations, and his limitations appear to be based primarily on the claimant's subjective reports. Dr. Limon indicated that the claimant was "extremely" impaired with his ability to sustain concentration, attention and persistence as well [as] in his ability to maintain effective social interaction. However, the report notes that the claimant had normal attention/concentration /persistence and it noted that [] while the claimant reported he did not like being in crowds and social situations he had several friends he spoke with on a weekly basis. He also indicated the claimant was "moderately to markedly" impaired in his ability to remember, understand and carry out simple as well as complex instructions, and had "moderate" impairments in his adaptive functioning, though he would be able to perform most tasks independently. However, Dr. Limon also noted in his report that the claimant had intact abstract thinking and reasoning as well as adequate judgment and insight. Additionally, Dr. Limon reported that the claimant's process of thought was intact and the claimant's working and remote memory were intact and on the recent memory test the claimant was able to recall two out of three words after five minutes. Dr. Limon's limitations are also at odds with the VA records during this same time period, as discussed above. For example, a mental status examination in May 2019 was essentially normal except for depressed mood and affect. At that time, the claimant reported a settlement on his worker's compensation claim

---

[4] Plaintiff also argues the ALJ erred in rejecting the lay witness evidence from Plaintiff's wife. The ALJ noted those third-party reports when discussing Plaintiff's mental limitations. Tr. 19. While the ALJ could have been clearer in discussing the weight accorded the function reports provided by Plaintiff's wife, those reports generally described the same limitations alleged by Plaintiff. As the ALJ did not err in rejecting Plaintiff's own testimony as to the extent of his limitations, to the extent the ALJ did not adequately discuss the lay witness evidence, any error was harmless. *Molina v. Astrue*, 674 F.3d 1104, 1123 (9th Cir. 2012).

> while a police officer. The VA's PHQ-0 depression screening score of 13 out of 27 is inconsistent with Dr. Limon's marked and extreme limitations. Still further the State agency psychological consultant, Dr. Ju, likewise did not find Dr. Limon's opinions persuasive, citing that the opinion is internally inconsistent and the "extreme limitations are not supported by the exam itself.

Tr. 23 (internal citations omitted).

These findings are supported by substantial evidence in the record. As discussed above, the ALJ's thorough review of the treating records was inconsistent with Dr. Limon's more extreme limitations. The consistency of a medical opinion with the overall record is a factor an ALJ may utilize when weighing a medical opinion. 20 C.F.R. §404.1520c(c)(2). And as noted above, while Plaintiff told Dr. Limon he was fired due to anger issues, contemporaneous records indicate Plaintiff was fired due to a positive drug screen following an on-duty accident. Finally, the ALJ found the opinion of Dr. Ju, a reviewing psychologist, more persuasive. Tr. 22. Regarding Dr. Kimel's opinion, Dr. Ju opined:

> Opinion is internally inconsistent, he had good interaction w/ doctor albeit some labiality was noted. The MSE was fairly normal other than noted dysphoria, normal judgment and insight, fairly normal ADLs reported w/ some need for prompts. This was a one time exam with no treating history. Opinion for "extreme" limitations is not supported by this exam or the overall MH evidence.

Tr. 97.

In accordance with the regulations, the ALJ explained how he "considered the supportability and consistency factors for" Dr. Limon's opinion. § 404.1520c(b)(2). Although Plaintiff argues another interpretation of the record is reasonable—i.e., that Dr. Limon's opinion demonstrates Plaintiff is disabled—that is not a legitimate reason for overturning the ALJ's conclusions. *See Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 523 (9th Cir. 2014) ("If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner.") (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996))).

11 – OPINION AND ORDER

Finally, Plaintiff argues the ALJ erred in failing to provide persuasive, specific, and valid reasons for rejecting the VA's disability rating. Plaintiff's argument, however, relies upon outdated regulations. Under the new regulations, for claims filed after March 27, 2017, that Commissioner "will not provide any analysis in our . . . decision about a decision made by any other governmental agency . . . about whether you are disabled[.]" § 404.1504. Here, as evidenced by the ALJ's thorough summary of the VA mental health treating records, the ALJ considered "the supporting evidence underlying the" VA's disability decision. *Id.* Under the new regulations, nothing more was required. *See Caleb H. v. Saul* 2020 WL 7680556 at *3 (E.D. Wa. Nov. 18, 2020 Opinion) (discussing new regulations and pointing to other district court opinions concluding ALJ's no longer required to give great weight to disability determinations of other agencies); *Kathleen H. v. Saul*, 2020 WL 5017760, at *5 (D. Or. Aug 25, 2020 opinion) (same). Because Plaintiff's argument relies on outdated regulations, his argument is meritless.

## **CONCLUSION**

The ALJ's decision is free of legal error and supported by substantial evidence. The Commissioner's final decision is therefore AFFIRMED.

IT IS SO ORDERED.

DATED this 27th day of May, 2021.

_____/s/ Michael J. McShane_____
Michael McShane
United States District Judge